**In re David ADAMS and Elizabeth Litchendorf Adams, Debtors.**

**Bankruptcy No. 87–05906.**

United States Bankruptcy Court, D. New Jersey.

Jan. 20, 1989.

Neil I. Sternstein, P.C. by Neil I. Sternstein, Woodbury, N.J., for debtors.

W. Cary Edwards, Atty. Gen. of New Jersey by Nancy M. Mahoney, Deputy Atty. Gen., Trenton, N.J., for State of N.J., Div. of Motor Vehicles.

## OPINION

ROSEMARY GAMBARDELLA,
Bankruptcy Judge.

The matter before the court arises from a motion to enforce the automatic stay filed on February 16, 1988 by David Adams the co-debtor herein against the State of New Jersey, Division of Motor Vehicles ("DMV")[1] wherein the debtor seeks an or-

---

1. The debtors' motion was actually brought against the State of New Jersey, Automobile Insurance Surcharge and Collection (hereinafter "AISC"), and answered by the State of New Jersey, Division of Motor Vehicles. For purposes of clarity this court notes that AISC, a part

der and injunction against DMV: (1) to prohibit that agency from further attempts to collect a New Jersey surcharge from the debtor, David Adams ("debtor"); (2) for payment of the debtor's attorneys' fees in connection with the motion; and (3) for the restoration of David Adams' driving privileges which were suspended due to his failure to pay surcharges imposed upon the debtor by DMV pursuant to N.J.S.A. 17:29A–35(b)(2) and (3) and N.J.A.C. 13:19–13.1 et seq., for the debtor's violation of N.J.S.A. 39:4–50(a) and N.J.S.A. 39:3–40. The undisputed facts of this case follow.

On or about February 9, 1984 the debtor was convicted of operating a motor vehicle under the influence of alcohol in violation of N.J.S.A. 39:4–50(a). Pursuant to that conviction the debtor's driver's license was suspended for six months and a fine was imposed by the New Jersey municipal court pursuant to N.J.S.A. 39:4–50. That suspension was honored and that fine was paid. Under the New Jersey Merit Rating Plan, N.J.S.A. 17:29A–35(b)(2), the DMV is required to levy annually for a three year period Merit Rating Plan surcharges of not less than $1,000.00 per year, on all New Jersey licensees convicted of operating a motor vehicle under the influence of alcohol. Accordingly, on June 12, 1985, DMV surcharged the debtor $1,000.00 for the 1985 surcharge period; on July 12, 1986, DMV surcharged the debtor $1,000.00 for the 1986 period; and on June 15, 1987, DMV surcharged the debtor $1,000.00 for the 1987 period.

On April 10, 1986 the debtor was convicted of operating a motor vehicle while his driver's license was suspended in violation of N.J.S.A. 39:3–40. In connection with this conviction the debtor was surcharged $250.00 pursuant to N.J.S.A. 17:29A–35(b)(3) and N.J.A.C. 13:19–13.1 et seq., which surcharge was levied on June 15, 1987, the same time as the 1987 surcharge

for debtor's previous conviction on June 15, 1987. Under N.J.A.C. 13:19–13.1 et seq. $250.00 surcharges are assessed annually for a three-year period upon persons convicted of driving while their licenses are suspended.[2]

The debtor paid in full by installments the $1,000.00 surcharge levied by DMV in connection with the 1985 surcharge period and $565.00 of the $1,000.00 levied in connection with the 1986 surcharge period. David Adams has paid no portion of the surcharge levied in 1987 related to either his 1984 conviction ($1,000.00) or his 1986 conviction ($250.00). On August 14, 1987 the debtor's New Jersey driving privileges were suspended pursuant to N.J.S.A. 17:29A–35(b)(2) for failure to remit the remaining Merit Rating Plan surcharges.

On September 28, 1987 David Adams and Elizabeth Litchendorf Adams, the debtors, filed a joint voluntary Chapter 13 petition under the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 and the Bankruptcy Judges, United States Trustees and Family Farmer Bankruptcy Act of 1986 (hereinafter "Code" or "Bankruptcy Code"). An order of dismissal of the debtors' Chapter 13 was entered by this court on January 20, 1988. That order was entered based upon the failure of the debtors to appear at the scheduled confirmation hearing on December 16, 1987 and the failure to make plan payments then due to the Chapter 13 Standing Trustee. On February 16, 1988 the debtors filed a notice of motion to reinstate the bankruptcy petition. Also on February 16, 1988 the instant motion to enforce the automatic stay was filed by the debtor David Adams. On March 30, 1988 the DMV restored the debtor's New Jersey driving privileges pending the outcome of the instant proceeding. On April 6, 1988 the court heard the debtors' motion to reinstate their Chapter 13 petition,

---

of the Bureau of Surcharge Administration, is located organizationally within the DMV, which is a division of the State of New Jersey, Department of Law and Public Safety.

**2.** Neither debtors nor defendant indicate that the surcharge assessed against David Adams in

connection with his violation of N.J.S.A. 39:3–40 and pursuant to N.J.S.A. 17:29A–35(b)(3) and N.J.A.C. 13:19–13.1 et seq. is a surcharge assessed annually for a three-year period. N.J.A.C. 13:19–13.1 however, clearly provides therefor.

granted the relief requested, reinstating the Chapter 13 petition, and entered an order to that effect on April 28, 1988. On April 21, 1988, the DMV filed a brief and appendix in opposition to the debtor's motion to enforce the automatic stay. This court heard oral argument on the motion on June 15, 1988 and reserved opinion on the matter until this time.

The debtors' Chapter 13 Statement filed with their original Chapter 13 petition lists the State of New Jersey Automobile Insurance Surcharge & Collections as an unsecured creditor.[3] The debt is listed in the amount of $755.00 as a liability of debtor David Adams. The debtors' Chapter 13 Plan, as amended and filed on January 13, 1988, proposes a payment of $3,500.00 to be distributed *pro rata* to unsecured creditors over a period of 36 months. The debtors' amended plan was confirmed by order of this court entered October 25, 1988.

The debtors' position is that enforcement of the New Jersey Automobile Insurance Reform Act of 1982 against David Adams is in direct conflict with the "fresh start" policy underlying the Bankruptcy Code; that New Jersey state statutes are invalidated by the supremacy clause of the United States Constitution, Article 6, Clause 2, to the extent that they are in conflict with federal bankruptcy law; and that enforcement of the New Jersey Automobile Insurance Reform Act of 1982 against the debtor is a violation of the automatic stay of 11 U.S.C. § 362. (*See* Debtor's "Brief in Support of Motion to Enforce Automatic Stay Against State of New Jersey–AISC" at pp. 2–3).

The State argues that Merit Rating Plan surcharges imposed pursuant to N.J.S.A. 17:29A–35 are nondischargeable such that the debtor herein may not escape obligations under the laws governing insurance in this state. The State rejects the proposition that the debtor is exempt from the Merit Rating Plan laws by virtue of the debtor's filing of a bankruptcy petition. Specifically, DMV argues:

(1) that application of New Jersey's Merit Rating Plan is not subject to or violative of the automatic stay provisions of 11 U.S.C. § 362(a);

(2) that the Merit Rating Plan's surcharges are not debts within the meaning of 11 U.S.C. § 101(11), are nondischargeable, and are therefore unaffected by the automatic stay;

(3) assuming plan surcharges are "debts", plan surcharges which arise from convictions for operating a motor vehicle while intoxicated in violation of N.J.S.A. 39:4–50 are nondischargeable under 11 U.S.C. § 523(a)(9);

(4) plan surcharges are otherwise nondischargeable under 11 U.S.C. § 523(a)(7);

(5) the Merit Rating Plan, N.J.S.A. 17:29A–35, does not discriminate against the debtor and therefore does not violate 11 U.S.C. § 525; and

(6) the state defendants are immune from suit in this court by virtue of the Eleventh Amendment to the United States Constitution.

(*See* "State of New Jersey, Division of Motor Vehicles Brief in Opposition to Debtor's Motion to Enforce Automatic Stay.")

This court's jurisdiction over this proceeding arises pursuant to 28 U.S.C. § 1334(a) and (b) and § 157(a). On July 10, 1984, the Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Act) became law. The 1984 Act amended 28 U.S.C. § 1334 to vest the district courts with "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Section 157 of 28 U.S.C. limits the authority of bankruptcy judges to act in referred matters. Title 28 U.S.C. § 157 provides in relevant part:

(a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all

---

3. *See* footnote 1, *supra.*

core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

Pursuant to an order dated July 23, 1984, and signed by Chief Judge Clarkson Fisher of the United States District Court for the District of New Jersey, the District Courts of this District have referred to bankruptcy judges "all cases under Title 11 of the United States Code and any or all proceedings arising under Title 11 of the United States Code, or arising in or relating to a case under Title 11 of the United States Code." The legislative history relating to Title 28 U.S.C. § 157 evidences an intent that only a narrow category of cases be construed as non-core proceedings. *See,* 130 Cong.Rec. H 7492, 98th Cong., 2d Sess. *reprinted in* 1984 U.S.Code Cong. & Ad. News 576, 579. Title 28 U.S.C. § 157(b)(2) contains a nonexhaustive list of "core" proceedings, including:

(A) matters concerning the administration of the estate;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

28 U.S.C. § 157(b)(2)(A), (O).

The controversy presently before this court is whether the enforcement of N.J. S.A. 17:29A–35(b)(2) and (b)(3) against the debtor violates 11 U.S.C. §§ 362(a) and 525. Such a case falls squarely within 28 U.S.C. § 157(b)(2)(A) and (O) since it concerns the administration of the debtor's estate and affects the debtor-creditor relationship.

■ The court will first address the preliminary matter of whether the instant motion is barred by the Eleventh Amendment of the United States Constitution. The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States

by Citizens of another State, or by Citizens or Subjects of any Foreign State. This court accepts the well established principle that an action against a state agency seeking monetary damages from public funds cannot be maintained. However, the instant debtor would be entitled to injunctive relief if, as it maintains, the Merit Rating Plan conflicts with the federal bankruptcy law. *See e.g., Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *In re Mart i.l.v.e.s. Goldrich,* 45 B.R. 514 (Bankr.E.D. N.Y.1984).

Moreover, 11 U.S.C. § 106(c) provides in relevant part:

(c) ... notwithstanding any assertion of sovereign immunity—

(1) a provision of this title that contains 'creditor', 'entity', or 'governmental unit' applies to governmental units; and

(2) a determination by the court of an issue arising under such a provision binds governmental units.

Thus, where sections of title 11 are applicable to governmental units, sovereign immunity is deemed waived and the bankruptcy court has jurisdiction to hear, decide and enforce its decision regarding the issue before it. *See, In re Coleman American Moving Services, Inc.,* 8 B.R. 379, 382 (Bankr.D.Kan.1980). As will be discussed below, 11 U.S.C. § 362 and § 525 specifically refer to "governmental unit." Accordingly, this court may make determinations under those statutory sections which bind governmental units. "Governmental unit" is defined under the Bankruptcy Code to mean, "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(26). The DMV falls within this definition of governmental unit.

Having established that this court has jurisdiction over the instant matter and that the DMV constitutes a governmental

entity, concerning which this court may render binding decisions, this court will move to the merits of the case before it.

The broad discharge granted to a Chapter 13 debtor who successfully completes a Chapter 13 plan is set forth in 11 U.S.C. § 1328(a), which states:

> (a) As soon as practicable after completion by the debtor of all payments under the plan, unless the court approves a written waiver of discharge executed by the debtor after the order for relief under this Chapter, the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—
>
> > (1) provided for under section 1322(b)(5) of this title; or
> >
> > (2) of the kind specified in section 523(a)(5) of this title.

The only exceptions to discharge under 1328(a) are for long-term debts and for alimony and child support. *In re Newton*, 15 B.R. 708, 709 (Bankr.N.D.Ga.1981). Thus, the contention by the DMV that the surcharge levied against the debtor to the extent it is determined to be a debt is nondischargeable under 523(a)(7)[4] and 523(a)(9)[5] is simply without merit because these provisions do not apply to Chapter 13 cases. This principle, if not clear from a reading of the Code itself, is emphasized by case law, which states generally that

> ... debts under § 523(a)(6) [another section of 11 U.S.C. 523(a) ] are not included in the list of debts which are not dischargeable under § 1328(a). The law is clear therefore that debts which fall

within the scope of § 523(a)(6) may still be discharged pursuant to § 1328(a). *In re DeSimone*, 25 B.R. 728, 729 (E.D.Pa. 1982), *cited in In re Johnson–Allen*, 69 B.R. 461, 464–65 (Bankr.E.D.Pa.1987).

The foregoing distinguishes the case *sub judice* from the recent case of *In re Roberto Lugo*, 94 B.R. 335 (D.N.J.1989). In *Lugo*, the Honorable H. Lee Sarokin, U.S. D.J. held that a surcharge levied against a chapter 7 debtor pursuant to a conviction entered in East Rutherford Municipal Court for driving while intoxicated in violation of N.J.S.A. 39:4–50(a) and under the New Jersey Merit Rating Plan, N.J.S.A. 17:29A–35, was nondischargeable in bankruptcy under 11 U.S.C. § 523(a)(9). Judge Sarokin reasoned that while the surcharge constituted a prepetition debt within the meaning of the Bankruptcy Code, the surcharge was excluded from discharge under § 523(a)(9) because the statutory language of that section "seems designed to insure that all debts arising out of the use of a motor vehicle while intoxicated are nondischargeable." *Id.* at 342. Because the debtor herein is a chapter 13 debtor and not subject to § 523(a)(9), the *Lugo* case is inapposite to the instant matter.

▪ Accordingly, if the surcharges imposed under N.J.S.A. 17:29A–35 create debts cognizable under the Bankruptcy Code, such debts would be dischargeable under Chapter 13 of the Code in the same way debts which are not dischargeable under a Chapter 7 case are dischargeable in a Chapter 13 case. *In re Newton, supra*, 15 B.R. at 709, *citing Matter of Lambert*, 10 B.R. 223 (Bankr.E.D.N.Y.1981). The

---

**4.** Section 523(a)(7) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(7) to the extent such debt is for fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty;

(A) relating to a tax of a kind not specified in paragraph (1) of this subsection; or

(B) imposed with respect to a transaction or event that occurred before three years before the date of the filing of the petition.

**5.** Section 523(a)(9) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(9) to any entity, to the extent that such debt arises from a judgment or consent decree entered in a court of record against the debtor wherein liability was incurred by such debtor as a result of the debtor's operation of a motor vehicle while legally intoxicated under the laws or regulations of any jurisdiction within the United States or its territories wherein such motor vehicle was operated and within which such liability was incurred.

threshold issue in the instant complaint is whether the surcharges are "debts" cognizable under the Bankruptcy Code.

Section 101(11) of the Bankruptcy Code provides that the word "debt" means liability on a claim. "Claim" is defined in Section 101(4) of the Bankruptcy Code as:

(A) right to payment, whether or not such right is reduced to a judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

In enacting Section 101(4), Congress sought the "broadest possible definition of a claim," intending that virtually all obligations to pay money be amenable to treatment in bankruptcy proceedings. *See* H.Rep. No. 95–595, 95th Cong., 1st Sess. 309 (1977), 1978 U.S.Code Cong. & Ad. News 5787, 6266. The Third Circuit Court of Appeals dealt with the determination of when a claim arises in bankruptcy in the case of *Matter of M. Frenville Co., Inc.*, 744 F.2d 332, 337 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985). In *Frenville*, the Third Circuit held that the threshold determination of whether a claim existed depended on if there was a "right to payment." *Frenville, supra*, 744 F.2d at 336. Recognizing that the Bankruptcy Code did not define "right to payment" the Third Circuit held that "while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'" *Frenville, supra*, 744 F.2d at 337, *citing, Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946). The *Frenville* court did not find any overriding federal law in its case, and therefore applied state law to determine when the right to payment arose.

Thus, whether or not the DMV has a right to payment is dependent upon state law. State law must be used to decide whether or not a claim exists. *Vanston Bondholders, supra*, 67 S.Ct. at 239. Once the existence of the claim is established, questions concerning whether the claim will be administered through the bankruptcy estate are determined by federal law. *Vanston Bondholders, supra*, 67 S.Ct. at 240.

A parallel may be drawn between the issue in this case and that faced by courts dealing with the dischargeability of criminal restitution orders. Although this court recognizes the differences between surcharges and criminal restitution, the analysis of the underlying state law is similar. Cases dealing with a determination of whether a criminal restitution order is a "debt" cognizable in bankruptcy have looked to the true purpose and intent behind the state law providing for the restitution. *See e.g., In re Button*, 8 B.R. 692 (Bankr.W.D.N.Y.1981); *In re Magnifico*, 21 B.R. 800 (Bankr.D.Ariz.1982). Accordingly, this court will analyze the purpose and intent behind the surcharges levied against the debtor herein.

The court in *Marks v. Snedeker*, 612 F.Supp. 1158 (D.N.J.1985) examined New Jersey automobile insurance laws as they existed prior to the enactment of the New Jersey Insurance Reform Act of 1982 and the New Jersey Automobile Full Insurance Availability Act, N.J.S.A. 17:29A–33 *et seq.* and N.J.S.A. 17:30E–1 *et seq.* ("Reform Act"), and thereafter. In *Marks v. Snedeker* the court stated:

Prior to January 1, 1983, the effective date of the Reform Act, an individual convicted of a drunken driving offense was subject to *criminal* penalties imposed by the State including fines, points on the license, license suspension or revocation, or imprisonment. *See e.g.* N.J. Stat.Ann. 39:4–50 *et seq.* (West Supp. 1984–85). In addition to these criminal penalties, a driver would almost inevitably be required, by his or her insurance carrier, to pay an insurance surcharge

for a period of three years in order to compensate the insurer for the added risk posed by a driver with a history of drunken driving. Due to the complex nature of this previous statutory and regulatory scheme, insurance rates varied dramatically throughout the state dependent upon a driver's individual characteristics and the primary location of the automobile. *See* Affidavit of J. Richard Boer, Exhibit A. In addition to being subject to significant rate discrepancies, drivers throughout New Jersey were often unable to obtain insurance coverage, despite a good driving record, due to the perceived lack of profitability for insurance carriers in New Jersey and their resultant decisions to discontinue writing new policies. *See* "Karcher, Overview of no-fault auto insurance," New Jersey Lawyer, No. 111 May 1985 at 8.

In an attempt to remedy the deficiencies in the State's automobile insurance system, the legislature has enacted numerous statutory provisions which significantly overhaul the system and create a new and similarly complex scheme designed to provide insurance which "will be affordable, available, and more equitable to the motorists [throughout the] State ...". N.J.Stat.Ann. 17:29A–34(j) (West 1985). A number of the reform provisions enacted are at issue here.

As a result of the Reform Act, individual insurance companies are no longer allowed to collect surcharges from motorists. Instead, a driver convicted of a drunken driving offense is billed directly by the State's Division of Motor Vehicles (DMV) which collects the surcharges and then disburses them to the New Jersey Automobile Full Insurance Underwriting Association (the Association) pursuant to N.J.Stat.Ann. 17:29A–35(b)(2) (West 1985). Underlying the removal of the surcharge system from the control of the individual insurance carriers is the need to eliminate the added insurance risk of drunken driving from rate calculations. This effort to standardize the insurance surcharge, resulting from drunken driving offenses statewide, is an integral component of the reform effort.

612 F.Supp. at 1159–1160. (Emphasis in text, footnote omitted).

The New Jersey Automobile Full Insurance Underwriting Association (hereinafter "Association") is an unincorporated, nonprofit association made up of all insurers licensed to transact automobile insurance in New Jersey. N.J.S.A. 17:30E–4. The Association runs an insurance pool in which drivers may obtain auto insurance if rejected elsewhere. *See* State of N.J. Senate Labor, Industry, and Professions Committee Statement to L.1986, c. 211, printed after N.J.S.A. 17:30E–3 (1987 Supplement). The Association is not a state agency and may sue or be sued in its own name. N.J.S.A. 17:30E–4 and 17:30E–7.

Besides insurance premiums, the Association obtains revenue from several types of insurance surcharges, including: accident surcharges which the insurer bills to policyholders and keeps, N.J.S.A. 17:29A–35(a); "residual market equalization charges" which the Insurance Commissioner imposes on all auto insurance policyholders, N.J.S.A. 17:30E–8; and surcharges which are imposed on motorists who commit any traffic offense which results in "points" against their driver's license, N.J.S.A. 17:29A–35(b)(1)(a), or who are convicted of driving while intoxicated or refusal to submit to a breathalizer, N.J.S.A. 17:29A–35(b)(2), as the debtor herein. In addition, N.J.S.A. 17:29A–35(b)(3) authorizes the Commissioner, after consultation with the Director of DMV, to (a) increase the dollar amount of motor vehicle surcharges on convictions; (b) impose surcharges for motor vehicle violations or convictions for which motor vehicle points are not assessed under Title 39 of the Revised Statutes; or (c) to reduce the number of points for which surcharges may be assessed below the level prescribed (e.g., six points). N.J.S.A. 17:29A–35(b)(3) and N.J.A.C. 13:19–13.1 *et seq.* Surcharges assessed under N.J.S.A. 17:29A–35(b)(3) and N.J.A.C. 13:19–13.1 *et seq.* also contribute to the Association's revenues.

The surcharges imposed upon the debtor in this case are provided for under the New Jersey Merit Plan, N.J.S.A. 17:29A–35(b)(2),

N.J.S.A. 17:29A–35(b)(3), and N.J.A.C. 13:19–13.1 *et seq.* N.J.S.A. 17:29A–35(b)(2) stated, in pertinent part at the time of debtor's 1984 violation:[6]

(2) Plan surcharges shall be levied for convictions under R.S. 39:4–50 or section 2 of P.L.1981, c. 512 (C. 39:4–50.4a), or for offenses of a substantially similar nature committed in other jurisdictions, for violations occurring on or after January 1, 1983. Surcharges under this paragraph shall be levied annually for a three year period, and shall be not less than $1,000.00 per year for each of the first two convictions, and not less than $1,500.00 per year for the third conviction occurring within a three year period. If a driver is convicted under both R.S. 39:4–50 and section 2 of P.L.1981, c. 512 (C. 39:4–50.4a) for offenses arising out of the same incident, the driver shall be assessed only one surcharge for the two offenses. The commissioner may increase the amount of surcharges as he deems necessary to effectuate the purposes of subsection d. of this section and P.L.1983, c. 65 (C. 17:29A–33 et al.), and may, pursuant to regulation, permit the deferral of all or any part of these surcharges as provided in paragraph (1)(a) of this subsection.

If, upon written notification from the Division of Motor Vehicles, mailed to the last address of record with the division a driver fails to pay a surcharge levied under this subsection, the license of the driver shall be suspended forthwith until the surcharge is paid to the Division of Motor Vehicles; except that upon satisfactory showing of indigency, the Division of Motor Vehicles may authorize payment of the surcharge on an installment basis over a period not to exceed six months.[7]

All moneys collectible under this subsection shall be billed and collected by the Division of Motor Vehicles. Of the moneys collected, 80% shall be remitted to the New Jersey Automobile Full Insurance Underwriting Association, and 20% shall be retained, for administrative expenses, by the Division of Motor Vehicles and turned over to the State Treasury for deposit in a special account to be used by the Division of Motor Vehicles, as may be necessary, to modernize its operations and improve its effectiveness and efficiency in order to discharge its statutory obligations.[8] Any moneys in the special account at the end of a fiscal year shall be transferred to the General Fund for use for general State purposes. Moneys shall be appropriated annually to the special account.

N.J.S.A. 17:29A–35(b)(3) stated in pertinent part at the time of debtor's 1986 conviction:

(3) In addition to any other authority provided P.L.1983. 65 (C.17:29A–33 et al.), the commissioner, after consultation with the Director of the Division of Motor Vehicles, is specifically authorized (a) to increase the dollar amount of the surcharges for motor vehicle violations or convictions, (b) to impose, in accordance with paragraph (1)(a) of this subsection, surcharges for motor vehicle violations or convictions for which motor vehicle points are not assessed under Title 39 of the Revised Statutes, or (c) to reduce the number of points for which surcharges may be assessed below the level provided in paragraph (1)(a) of this subsection, except that the dollar amount of all surcharges levied under the New Jersey Merit Rating Plan shall be uniform on a Statewide basis for each filer, without regard to classification or territory. Surcharges adopted by the commissioner on or after January 1, 1984 *for motor vehicle violations or convictions for which*

6. N.J.S.A. 17:29A–35 was amended by L.1985, c. 520 § 1, effective January 21, 1986, and L.1986, c. 211 § 8, effective January 12, 1987. N.J.S.A. 17:29A–35 was further amended by L.1988, c. 156; A. 3702, section 9, p. 11, effective November 14, 1988.

7. The 1985 amendment allowed installment payments of the surcharge to be made over a ten month rather than six month period.

8. The 1988 amendment directs DMV to remit at least 90% to JUA and to retain 10% to cover the actual cost of administering the collection of the surcharge.

motor vehicle points are not assessable under Title 39 of the Revised Statutes shall not be retroactively applied but shall take effect on the date of the New Jersey Register in which notice of adoption appears or the effective date set forth in that notice, whichever is later.

N.J.A.C. 13:19–13.1–13.3, promulgated pursuant to N.J.S.A. 17:29A–35, effective March 19, 1984, states:

### 13:19–13.1 Surcharges for three year period; convictions; amounts

(a) Plan surcharges shall be levied by the Division of Motor Vehicles for convictions of violations set forth in (b) below which violations occurred on or after March 19, 1984, the effective date of the original regulation. The surcharges shall be annually assessed for a three year period.

(b) The following violations shall be subject to surcharges as indicated in (a) above for the amount set forth below:

| | | |
|---|---|---|
| 1. N.J.S.A. 39:3–10 | Unlicensed driver | $100.00 |
| 2. N.J.S.A. 39:3–40 | Driving while suspended | $250.00 |
| 3. N.J.S.A. 39:4–14e | Failing to have insurance on motorized bicycle | $100.00 |
| 4. N.J.S.A. 39:6B–2 | Failing to maintain liability insurance on motor vehicle | $250.00 |

### 13:19–13.2 Surcharges for three year period; administrative violations; amounts

(a) Plan surcharges shall be levied by the Division of Motor Vehicles for violations resulting in license suspensions imposed administratively which are set forth in (b) below and which violations or suspensions have occurred on or after March 19, 1984, the effective date of the original regulation. The surcharge shall be assessed each year for a three year period and shall be in addition to the license restoration fee charge pursuant to N.J.S.A. 39:3–10a.

(b) The following violations resulting in administrative license suspensions shall be subject to surcharge as indicated in (a) for the amount set forth below:

| | |
|---|---|
| 1. Operating while suspended | $250.00 |
| 2. Failure to maintain liability insurance on motor vehicle | $250.00 |

(c) Plan surcharges levied pursuant to (b)3 above shall be in addition to any other plan surcharge to which a driver is subject under the Merit Rating Plan.

### 13:19–13.3 Refund of surcharge; deletion of suspension

A person who previously had been suspended for failing to pay a surcharge pursuant to N.J.A.C. 13:19–13.1 or 13:19–13.2 for a violation or suspension that occurred on or after January 1, 1983, but before March 19, 1984, will have the driving privilege suspension deleted without the payment of the mandatory restoration fee. If the restoration fee had been previously paid, the fee will be refunded, provided the person was serving no other suspension.

N.J.S.A. 17:29A–35(d) further provides:

d. The dollar amount of all motor vehicle conviction surcharges shall be at least equivalent to the differential between the rates charged to insureds as promulgated by the rating bureau which files rates for the greatest number of insurers in the voluntary private passenger automobile insurance market in this State and the supplement I rates in use as of December 31, 1982 by the automobile insurance plan established pursuant to P.L.1970, c. 215 (C. 17:29D–1), and the amount collectible under the motor vehicle conviction surcharge system in use by the automobile insurance plan established pursuant to P.L.1970, c. 215 (C. 17:29D–1 et seq.) prior to the implementation of this act; except that in the first year of operation of the New Jersey Automobile Full Insurance Underwriting Association, the dollar amount of all motor vehicle surcharges shall be sufficient to eliminate the need for imposition of a residual market equalization charge authorized under section 20 of P.L.1983, c. 65 (C. 17:30E–8).

Surcharge funds collected by the DMV are infused directly into the insurance system via the Association. In the Preliminary Statement Section of the State's brief, DMV states:

A key feature of the Reform Act, which is critical to the disposition of this

case, is that the Merit Rating Plan is a replacement for the system of non-uniform surcharges which previously existed under rating systems filed with and approved by the Commissioner of Insurance. Far from being a penalty, Plan surcharges are an element of this system of insurance ratemaking reform. See *Clark v. New Jersey Div. of Motor Vehicles*, 211 N.J.Super. 708 [512 A.2d 588] (App.Div.1986).

It is important to remember that as of January 1, 1984, no insurance company is permitted to collect premium surcharges based on motor vehicle convictions. *N.J. S.A.* 17:29A–35(c). The old system has been abolished and drivers are no longer required to make payments under that system. Instead, all surcharges for such offenses are assessed by and paid directly to the New Jersey Division of Motor Vehicles. Any person who fails to pay the insurance surcharge will have his drivers license suspended until the surcharge is paid. [footnote omitted]. Under the Merit Rating Plan, high risk drivers who might have escaped a surcharge in the past are no longer permitted to continue to operate vehicles on the highways of this State unless they have made a fair contribution to the auto insurance system to compensate for the additional loss exposure they represent.

Eighty percent of the surcharge revenues collected by DMV are transmitted directly to the Association, the successor to the AIP, while 20% is retained by DMV to modernize its operations and to "improve its effectiveness and efficiency in discharging its statutory obligations relating to the automobile insurance system." (*i.e.* loading expenses). *N.J.S.A.* 17:29A–34(i) and 17:29A–35(c) [sic].[9] Therefore, the surcharges are infused directly into the auto insurance system. However should the amounts collected by the Association from all sources (including Plan surcharges forwarded by DMV) prove insufficient to permit the Association to operate on a no profit, no loss basis, a residual market equalization charge shall be levied on each insured vehicle in this State to offset the anticipated losses of the Association. *N.J.S.A.* 17:30E–3(*o*), *N.J.S.A.* 30E–8(b). [footnote omitted]. Thus, to the extent to which Plan surcharges are defeated, avoided or ignored, to that extent the essential design of the Reform Act is thwarted and all drivers (good and bad alike) must compensate the insurance system.

The remedial impact of the Plan is clear. It replaces and makes uniform the prior surcharge systems used in both the voluntary and residual markets. It makes the surcharges more equitable by shifting to all of those who have manifested a disregard for the laws promoting highway safety the burden of bearing the full cost of the additional risk they pose. Good drivers will no longer be required to subsidize poor drivers who could previously have avoided contributing to the system, and bad drivers will no longer be required to pay excessive surcharges based upon demographic factors already taken into account by the rate classification system.

(*See* "State of New Jersey, Division of Motor Vehicles Brief in Opposition to Debtor's Motion to Enforce Automatic Stay" filed April 21, 1977 at pp. 13–15).

In *Clark v. New Jersey Division of Motor Vehicles*, 211 N.J.Super. 708, 512 A.2d 588 (App.Div.1986), the Appellate Division affirmed an administrative law judge's determination that a motorist was subject to the surcharge under the Merit Rating Plan. The court determined that the surcharge did not violate the constitutional prohibition against *ex post facto* laws, stating:

This prohibition applies only when the legislation is retrospective in operation. *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17, 23 (1981). The Merit Rating Plan surcharge was approved prior to petitioner's arrest for violating N.J.S.A. 39:4–50. While calculation of penalties under the Plan applies to offenses based upon consideration of a licensee's driving history, the Plan only

---

9. *See* footnote 8, *supra*.

relates to the future operation of a motor vehicle. The Merit Rating Plan merely gives the Division of Motor Vehicles the responsibility of assessing surcharges for high risk drivers in a uniform manner, as opposed to the area-based industry surcharge previously in existence. The law establishes an industry surcharge system based upon an individual's driving history and sets qualifications for the offender's continued driving on the highway.

Petitioner's claim that the statute is punitive in nature also must fail. The prohibition against *ex post facto* law only applies to punitive legislation. *Galvan v. Press,* 347 U.S. 522, 531, 74 S.Ct. 737, 742–743, 98 L.Ed. 911, 922 (1954). *It does not apply to retrospective legislation involving a statutory system of civil penalties. Harisiades v. Shaughnessy,* 342 U.S. 580, 594–595, 72 S.Ct. 512, 521, 96 L.Ed. 586, 601 (1952).

The label on a law does not make it civil or non-punitive. The *ex post facto* prohibition cannot be avoided by merely calling a statute civil when in effect it is criminal. *Burgess v. Salmon,* 97 U.S. (7 Otto) 381, 403, 24 L.Ed. 1104, 1106 (1878). Here the purpose and effect of the Merit Rating Plan surcharges are clearly remedial and civil. Historically, motor vehicle violations, including N.J.S.A. 39:4–50 and N.J.S.A. 39:4–50.41, have not been considered crimes but traffic offenses. *See State v. Cusik [Cusick],* 110 N.J.Super. 149, 151 [264 A.2d 735] (App.Div.1970); *State v. McCarthy,* 30 N.J.Super. 6, 8 [103 A.2d 169] (App.Div.1954). The statute does not deprive a person of any status, opportunity or privilege. Instead, the person must pay a monetary assessment in accordance with a uniform schedule for the privilege of driving on the highways. All persons in the class pay in accordance with the fixed charges for violations they have accumulated. The plan is no more or less "punitive" in nature than the State requirements of compulsory insurance. In view of the carnage caused by persons driving while intoxicated, the surcharges can hardly be said to be excessive. We conclude N.J.

S.A. 17:29A–35(b) is not punitive in nature and not proscribed under the *ex post facto* provision of the State or federal constitutions.

*Clark v. New Jersey Division of Motor Vehicles, supra,* 211 N.J.Super. at 710–11, 512 A.2d 588. (Emphasis added).

The Honorable William H. Gindin of this court analyzed the Merit Rating Plan in the context of a chapter 7 case in *In re Graham,* 85 B.R. 713 (Bankr.D.N.J.1988). In *Graham* the debtor was convicted of operating a motor vehicle while under the influence of alcohol in violation of N.J.S.A. 39:4–50. Subsequently, the debtor and his wife filed a Chapter 7 petition. The debtors listed a $2,000.00 Merit Rating Plan debt on their bankruptcy schedule. The DMV thereafter brought an action to determine the dischargeability of the surcharge under 11 U.S.C. § 727. The court characterized the surcharge as "simply an additional premium payable for the necessary insurance," and further stated that "[o]ne could liken this to the payment of a premium to an insurance agent who retains his commission and remits the balance of the premium to the insurer." *In re Graham, supra,* 85 B.R. at 716 and n. 1.

The *Graham* court further relied on the use of prior experience to establish future insurance premiums in holding that there was no pre-petition "right to payment" and therefore the surcharge was not a debt dischargeable under 11 U.S.C. § 727:

The concept of using prior experience in order to establish future premiums is one which has been accepted by this court. In *In re Primrose Bedspread Corp.,* 67 B.R. 659 (Bankr.D.N.J.1986) it was held that the uniform application of past experience was an appropriate measure of future premiums. "[E]xperience ... [may be used] ... in calculating the experience rating of the debtors and the subsequent premiums owed ...". *In re A.C. Williams Co.,* 51 B.R. 496, 497 (Bankr.N.D.Ohio 1985). An additional premium based upon the specific statistics of drivers who are guilty of driving while intoxicated, or who failed to take a breathalyzer test, or who have accumu-

lated a large number of points, is no different than adjusting premiums based upon the age of the driver or the geographic location of the motor vehicle. Such distinctions historically have been considered appropriate in the assessment of insurance premiums and the establishment of appropriate rates. N.J.S.A. 17:29A–4. *See also, Coro Brokerage, Inc. v. Rickard,* 29 N.J. 295, 148 A.2d 817 (1959).

Thus, since there is no pre-petition "right to payment" no matter how incomplete same may be, there can be no debt dischargeable under 11 U.S.C. 727.

.     .     .     .     .

Since the entire surcharge in the instant case was prospective and intended to go into effect subsequent to the filing of the petition, the claimed charge is not dischargeable.

*In re Graham, supra,* 85 B.R. at 716–17.

The *Graham* court characterized the three-year surcharge in that case as prospective in nature and not a pre-petition right to payment since it would only become effective post-petition. 85 B.R. at 716–17, *Contra In re Roberto Lugo, supra,* at 340.

This court finds that the debtor herein has a prepetition obligation to pay a three-year surcharge of $3,000.00, allocated at $1,000.00 per year in connection with his 1984 conviction; and a prepetition obligation to pay a three-year surcharge of $750.00, allocated at $250.00 per year in connection with his 1986 conviction.[10] With regard to the 1984 conviction, debtor paid the 1985 $1,000.00 surcharge in full, $565.00 of the 1986 $1,000.00 surcharge, and no portion of the 1987 $1,000.00 surcharge. The obligation to pay the three-year surcharge arose out of the debtor's conviction for operating a motor vehicle under the influence of alcohol in violation of N.J.S.A. 39:4–50. This conviction was entered on or about February 9, 1984, more than three years before the filing of the debtor's petition. The three-year surcharge is levied at the time of the convic-tion, albeit it is a $3,000.00 obligation which is paid in three equal, yearly installments. With respect to the 1986 conviction, debtor has paid no portion of the $250.00 surcharge assessed against him on June 15, 1987. The obligation to pay $250.00 per year for three years arose out of debtor's April 10, 1986 conviction of driving while his license was suspended in violation of 39:3–40. Both convictions therefore were prior to the filing of the debtor's bankruptcy petition on September 28, 1987. Accordingly, the DMV's right to payment on surcharges assessed in connection with both of the debtor's convictions, arose pre-petition and the entire amounts are therefore prepetition debts dischargeable under 11 U.S.C. § 1328(a). The fact that DMV's right to payment is enforceable by suspension of the driver's license rather than by a money judgment in favor of DMV is not sufficient in this court's view to render any portion of the debtor's obligation not a debt pursuant to 11 U.S.C. § 101(11).

This outcome complies with the Third Circuit decision in *Matter of Frenville, supra,* 744 F.2d 332. In *Frenville,* the court, applying state law, held that a claim for contribution or indemnification did not accrue at the time of the commission of the act, which was pre-petition, but rather at the time of payment of the judgment flowing from the act, which was post-petition. *Matter of Frenville, supra,* 744 F.2d at 337. Accordingly, the claim was held to arise post-petition and the automatic stay of § 362 was deemed not applicable to an action to collect on the indemnification claim. *Id.*

In the instant case, the DMV's right to payment accrued when the debtor was convicted of violating an offense covered by the Merit Rating Plan. The fact that this right to payment was deferred over a three-year period is of no consequence in determining the accrual of a debt or claim cognizable in bankruptcy. Such a situation is commonplace in bankruptcy. A variety of debts including mortgages, and contract obligations, accrue pre-petition and provide for payment over several years which may

---

**10.** *See* footnote 2, *supra.*

extend post-petition. The fact that a bill is not presented to the debtor until after the filing of a bankruptcy petition, or that some portion of a bill presented to the debtor prior to his bankruptcy filing covers a period of time beyond the filing date, does not change the character of the debt obligation.

Furthermore, the broad definition of "claim" supports the inclusion of the surcharge within the debts subject to a Chapter 13 discharge. The DMV's "claim" in the debtor's case arose when he was convicted in state court. The "debt", or liability on that claim, existed at that time and, like most debts, was entitled to thrive in the bankruptcy context. A narrow reading of "claim" and "debt" in the bankruptcy context is obviously contrary to legislative intent. Categorizing a debt as post-petition in nature merely because some portion of the billing period is post-petition is contrary to the legislative intent. The notions of "claim" and "debt" as defined in the Bankruptcy Code have an extremely broad, virtually limitless meaning. *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 709, 83 L.Ed.2d 649 (1985). The district court in *In re Roberto Lugo, supra*, held that the surcharge at issue therein was a prepetition debt. The *Lugo* court stated:

> .... Under the current system, the surcharge is imposed on debtors regardless of whether they own a car. In this case, Mr. Lugo has not owned a car or carried insurance since 1985. "Surcharge" is a misnomer, since there is no premium to which the statutory payment is *added*. Mr. Lugo obtains no benefit by virtue of paying the $3,000. The court rejects appellees' contention that the surcharge constitutes a prospective insurance premium.

.    .    .    .    .

The legislative history to the Bankruptcy Reform Act of 1978 notes that the definition of "claim" marks a "significant departure" from prior law. The legislative history is clear that

> By this broadest possible definition ... the bill contemplates that all legal obligations of the debtor, no matter how

remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6266; *see also* S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted in* 1978 U.S.Code Cong. and Admin.News 5785, 5807–08 (virtually identical statement). The Third Circuit has recognized the "far-reaching scope of this definition." *In re Remington Rand Corp.*, 836 F.2d 825, 829 (3d Cir. 1988).

In *Ohio v. Kovacs*, 469 U.S. 274 [105 S.Ct. 705, 83 L.Ed.2d 649] (1985), the Supreme Court unanimously confirmed that "claim" was to be interpreted broadly. In *Kovacs*, the State of Ohio obtained an injunction ordering Kovacs to clean up a hazardous waste site. Thereafter Kovacs filed a petition for bankruptcy. The Supreme Court held that Kovacs' obligation under the injunction was a "debt" or "liability on a claim" subject to discharge under the Bankruptcy. 469 U.S. at 283 [105 S.Ct. at 709].

In examining the Bankruptcy Code, the Court noted that Congress had made nine exceptions to discharge in 11 U.S.C. Section 523(a). The Court made clear that

> Except for the nine kinds of debts saved from discharge by 11 U.S.C. 523(a), a discharge in bankruptcy discharges the debtor from all debts which arose before bankruptcy. 469 U.S. at 278 [105 S.Ct. at 707].

The Court rejected the State's contention that Kovacs' obligation to clean the site was not a "debt." The basis for the Court's holding was that the cleanup duty had been reduced to a *monetary obligation, id.* at 282 [105 S.Ct. at 709], thus giving rise to a right to payment under Section 101(4).

The court finds *Kovacs* to be dispositive on the issue of whether the $3,000 surcharge is a "debt" or "liability on a claim." In *Kovacs*, as in this case, the State imposed a monetary obligation on

the debtor, to be applied towards costs associated with the debtor's actions. Appellees' argument that the surcharge is not a "claim" or "debt" because it serves as a "substitute" for insurance or is to be used in the future to pay for costs attributable to Mr. Lugo fails under *Kovacs*. In *Kovacs*, a money obligation arose out of the claimant's contamination of the environment and the money was to be used to pay for clean-up. The Supreme Court held that the obligation was dischargeable under the Bankruptcy Code. Under the holding of *Kovacs*, the court finds that the $3,000 surcharge is a "debt" or "liability on a claim."

.     .     .     .     .

The existence of a valid claim also depends on *when* a right of payment arises. *In Re Remington Rand Corp.*, 836 F.2d 825, 832 (3d Cir.1988). Although "claim" is defined by Section 101(4), the Code does not define *when* a right to payment arises. This question is to be determined by reference to state law. *Matter of M. Frenville Co., Inc.*, 744 F.2d 332, 337 (3d Cir.1984), *cert. denied*, 469 U.S. 1160 [105 S.Ct. 911, 83 L.Ed.2d 925] (1985); *In re Graham*, 85 B.R. 713, 715 (Bkrtcy.D. N.J.1988).

Appellees seem to argue that the $3,000 surcharge is not a prepetition debt because it will be used *prospectively* to cover JUA's costs, again relying on *A.C. Williams Co.* and *Primrose Bedspread Corp. See also Clark*, 211 N.J.Super. at 710 [512 A.2d 588]. The court is not persuaded that the fact that a surcharge will be used to cover *future* costs renders it a *post*-petition debt. Appellees state "[s]urcharges are, by operation of the statute, an inevitable consequence of a conviction for drunk driving." (Appellees' Brief, at 29). The DMV sent a notice demanding payment of the surcharge in January, 1986, six months before Mr. Lugo even filed a petition for bankruptcy. The court is satisfied that the surcharge accrued prior to the filing for bankruptcy in this case. This finding that the surcharge gave rise to a prepetition right to payment does not end the court's inquiry, for Congress also created

exemptions from discharge for nine types of debts, two of which are at issue here.

At 339–341 (footnote omitted).

■ The debtor herein argues that enforcement of the New Jersey Merit Rating Plan by the DMV against the debtor conflicts with the discharge provisions and fresh start policies of the Bankruptcy Code and as applied to the debtor herein violates 11 U.S.C. § 525(a).

The United States Supreme Court addressed the issue of a conflict between the former Bankruptcy Act and state legislation in the case of *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). The state legislation in question in *Perez* was a section of Arizona's Motor Vehicle Safety Responsibility Act, which provided for the suspension of the license of a driver involved in a motor vehicle accident, and the suspension of the registration of the accident vehicle, until security, sufficient to satisfy any judgment which might be obtained for damages resulting from the accident, was deposited. Another provision of the Motor Vehicle Safety Responsibility Act provided that a discharge in bankruptcy would not relieve the debtor from any requirements of the Act. Furthermore, pursuant to Arizona law, once an individual's license and registration had been suspended, they remained suspended and no other license or registration could be issued in the same name, until the individual, in addition to satisfying the judgment debt, gave proof of future financial responsibility.

The *Perez* court set forth a two step test for determining whether a state statute and a federal statute are in conflict so as to render the state statute invalid under the Supremacy Clause. Pursuant to the test, the statutes at issue must first be construed, and next the statutes must be compared to determine whether a conflict exists. Applying this test to the facts before it, the *Perez* court determined that the purpose of the state automobile regulations was to protect the public from financial hardship which could result from the negli-

gence of financially irresponsible automobile operators. With regard to the Bankruptcy Act, the *Perez* court established that its purpose was to provide debtors with "'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" 402 U.S. at 648, 91 S.Ct. at 1710 (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).

In applying the second step of the two-prong test, the *Perez* court maintained that its function was to determine whether the state statute "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" 402 U.S. at 649, 91 S.Ct. at 1711 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Ultimately, the court concluded that the statutes were in conflict, and that thus, the automobile regulations were constitutionally invalid. 402 U.S. at 656, 91 S.Ct. at 1714.

Section 525 of the Bankruptcy Code codifies the Supreme Court's decision in *Perez v. Campbell.* Title 11 U.S.C. § 525(a) provides in relevant part:

a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been inoslvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

The legislative history of 11 U.S.C. § 525 indicates that the list of forms of discrimination contained in 11 U.S.C. § 525 is not intended to be limiting:

The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions ... or by other organizations that can seriously affect the debtor's livelihood or fresh start ... The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in § 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

S.Rep. No. 989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5867.

"Governmental unit" is defined by the Bankruptcy Code as follows:

'governmental unit' means United States; State; Commonwealth; District; Territory, municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(26). The DMV is clearly within the scope of this statutory definition.

In the instant case, the DMV argues that in this case the debtor, a licensed driver who has been convicted of operating a motor vehicle under the influence of alcohol in violation of N.J.S.A. 39:4–50 and operating a motor vehicle while his driver's license was suspended in violation of N.J.S.A. 39:3–40, seeks to avoid payment of the surcharges imposed by the Merit Rating Plan while continuing to drive in the State of New Jersey and thereby retain to himself the benefits of the Reform Act which pro-

vide an insurance policy at voluntary market rates and freedom from any carrier imposed surcharges.

In *Duffey v. Dollison,* 734 F.2d 265 (6th Cir.1984), the debtors alleged that enforcement of Ohio's Motor Vehicle Financial Responsibility Act as to them was discriminatory and thus violative of 11 U.S.C. § 525. The financial responsibility law required the suspension of driver licenses and registrations of individuals who failed to pay judgments arising out of automobile accidents within thirty days of a written request by the judgment creditor or by the judgment creditor's attorney. Pursuant to the financial responsibility law, driving privileges were to remain suspended for seven years, or until the judgment was stayed or satisfied and proof of financial responsibility was submitted. 734 F.2d at 269. It is noteworthy that a previous version of the financial responsibility statute had been deemed unconstitutional to the extent that it required the payment of a tort judgment entered as a result of an automobile accident as a prerequisite to the restoration of driving privileges. This payment requirement had applied regardless of whether the judgment had been stayed or discharged in bankruptcy. 734 F.2d at 269.

The *Duffey v. Dollison* court held that the new financial responsibility statute, which required individuals who failed to pay judgments arising out of automobile accidents to post proof of financial responsibility as a prerequisite to restoration of their driving privileges, was not preempted by federal bankruptcy law. In reaching its decision, the court distinguished the statutory provision at issue therein from the one at issue in *Perez v. Campbell.* The *Duffey v. Dollison* court stated that in order to regain privileges, the statute in *Perez v. Campbell* required payment of a judgment, even if its collection was stayed or it was discharged in bankruptcy, while the statute in *Duffey v. Dollison* merely required proof of future financial responsibility. 734 F.2d at 272.

The court in *In re A.C. Williams Co.,* 51 B.R. 496 (Bankr.N.D.Ohio 1985) commented upon the Sixth Circuit's decision in *Duffey v. Dollison, supra,* as follows:

> The Sixth Circuit in *Duffey* noted that the legislative history to section 525 indicates that the section was intended to assure the debtor a "fresh start" by preventing governmental discrimination based "solely" on the bankruptcy of the debtor and to strengthen the anti-reaffirmation policy of section 524(b). *Duffey,* 734 F.2d at 271. "'[T]he primary purpose of section 525 of the Bankruptcy Code is to prevent the government either from denying privileges to individuals solely as a reaction to their filing bankruptcy or from conditioning the grant of privileges on the bankrupt's reaffirmation of certain debts.'" *Id.* (quoting *Duffey v. Dollison,* No. C–2–81–1154, slip op. at 8 (S.D.Ohio Aug. 13, 1982)). Legislative history indicates that section 525 is not a prohibition of all factors, such as future financial responsibility or condition, and net capital rules, but it only prohibits the *discriminatory* examination of certain factors, e.g. the fact of bankruptcy or the discharge of a debt in bankruptcy. 734 F.2d at 271.

51 B.R. at 500.

In the case at bar, N.J.S.A. 17:29A–35(b)(2) and N.J.S.A. 17:29A–35(b)(3), the statutes presently in issue, unlike the statute at issue in *Duffey v. Dollison,* require that the debtor pay pre-petition debts which are in the nature of civil penalties in order to maintain his driving privileges. Nor do the statutes deal with compulsory insurance. The application of N.J.S.A. 17:29A–35(b)(2) and (b)(3) to the instant debtor resulting in suspension of the debtor's driver's license as a result of unpaid pre-petition surcharges does not represent a valid financial responsibility rule. *Accord, Miller v. Anckaitis,* 436 F.2d 115 (3d Cir.1970), *cert. denied,* 403 U.S. 910, 91 S.Ct. 2203, 29 L.Ed.2d 688 (1971) (holding that the Pennsylvania Motor Vehicle Safety Responsibility Provisions, Pa.Stat.Ann.Tit. 75 § 1414 (1960), when as applied to a debtor provided for suspension of the debtor's license and driver registration where a tort judgment remained unsatisfied, notwithstanding a discharge in bankruptcy,

and where the judgment debt had been held vicariously liable for omission of a subagent, was unconstitutional as in conflict with § 17 of the Bankruptcy Act).

The debtor in this case to comply with the provisions of the New Jersey Merit Rating Plan will have to pay pre-petition debts in derogation of the priorities established by the Bankruptcy Code to retain his driving privileges. There exists an inherent conflict between the effect and enforcement of the New Jersey Merit Rating Plan on the debtor and the goals and policies of the bankruptcy laws. The debtor cannot be compelled to satisfy the unpaid pre-petition surcharges, except to the extent such payment is consistent with the debtors' Chapter 13 plan, which provides in this case for a pro-rata payment of $3,500.00 to unsecured creditors under the debtors' Chapter 13 plan.

Here the court notes that N.J.S.A. 17:29A–35(b)(2) as amended in 1985 provides that upon a showing of indigency the surcharges may be paid on an installment basis not to exceed ten months. The debtor proposes to pay a portion of the surcharge along with other unsecured debts over the plan term of three years. Here there is an inherent conflict between N.J.S.A. 17:29A–35(b)(2) which provides, upon a showing of indigency, payment of plan surcharges over ten months, and the ability of a Chapter 13 debtor under Section 1322(c) to make payments under a plan for a period from three to five years. Under the rule of *Perez v. Campbell,* the provisions of Section 1322(c) must control.

Accordingly, this court holds that the New Jersey Merit Rating Plan surcharges are "debts" cognizable in bankruptcy and dischargeable under the discharge granted under § 1328(a), after the debtor has completed payments under his Chapter 13 plan. The court further holds that enforcement of the New Jersey Merit Rating Plan against the debtor to the extent that N.J.S.A. 17:29A–35(b)(2) and (b)(3) provide that the debtor's driver's license shall be suspended until the surcharge is paid violates 11 U.S.C. § 525. It is clear that a Chapter 13 debtor is protected from collection efforts by the DMV during the interim between the filing of the Chapter 13 petition and the entry of discharge by the automatic stay of 11 U.S.C. § 362. *In re Gilliam,* 67 B.R. 83, 86 (Bankr.M.D.Tenn.1986).

Under 11 U.S.C. § 362, the filing of a bankruptcy petition operates as a stay with regard to actions against a debtor including:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

11 U.S.C. § 362(a).

The scope of the automatic stay provision of 11 U.S.C. § 362 is broad and encompasses all proceedings, even those not before governmental tribunals. H.R. No. 595,

95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6297. Title 11 U.S.C. § 362 freezes the rights of creditors as of the date of the filing of a petition under the Bankruptcy Code in order to protect against the piece-meal distribution of the bankruptcy estate. The automatic stay also operates to ensure that claims against a debtor's estate are resolved in an orderly fashion in accordance with the priorities scheme of the Bankruptcy Code, and to prevent a " 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir.1982) (quoting *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y.1981)).

Section 362(b)(4) and (5) provide:

(b) The filing of a petition ...does not operate as a stay—

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

The legislative history of this section is instructive as to its purpose:

Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protec-tion, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay. Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

H.R. No. 595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.Cong. & Ad.News, 5787, 6299.

This court recognizes that the regulation of the business of insurance is clearly a proper and traditional subject for the state's exercise of its police power. *See Country-Wide Insurance Co. v. Harnett*, 426 F.Supp. 1030, 1034 (D.N.Y.1977), *aff'd*, 431 U.S. 934, 97 S.Ct. 2644, 53 L.Ed.2d 252; *State v. McCourt*, 131 N.J.Super. 283, 286, 329 A.2d 577 (App.Div.1974); the McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.*[11], 15 U.S.C. § 1012(b). In this respect the United States Supreme Court has established that states may constitutionally require all motorists to carry liability insurance or post security before they are issued driver's licenses. *See Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). *See also Duffey v. Dollison*, 734 F.2d 265 (6th Cir.1984).

The Third Circuit, in the case of *Penn Terra Limited v. Department of Environmental Resources, Commonwealth of*

---

**11.** The McCarran–Ferguson Act provides in relevant part:

Congress declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business on the several States.

15 U.S.C. § 1011.

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance, .... unless such Act specifically relates to the business of insurance....

15 U.S.C. § 1012(a) and (b).

*Pennsylvania,* 733 F.2d 267 (3d Cir.1984) (*Penn Terra*), was called upon to determine whether a conflict existed between the United States Bankruptcy Code and state environmental laws promulgated by the Commonwealth of Pennsylvania. In *Penn Terra,* the Commonwealth of Pennsylvania was attempting to force a company, which had filed a petition for relief under the Bankruptcy Code, to correct violations of state environmental laws. Correction of the violations, however, would deplete the assets of the corporation, which assets otherwise would be used to repay the debts of general creditors.

In determining whether the automatic stay provisions of 11 U.S.C. § 362 operated to preclude the state from enforcing its environmental laws, the *Penn Terra* court examined the underlying policies of the Bankruptcy Code and of the subject environmental laws. The court also considered the general policies regarding pre-emption. The court noted that protection and preservation of a debtor's assets, so that the funds of a bankruptcy estate may be equitably distributed amongst creditors without unfair preference, is central to the statutory scheme of the Bankruptcy Code. 733 F.2d at 269, 278. The court further noted the important purposes of the state's environmental laws, which are, the protection and preservation of the state's natural resources and the correction of damage to the environment by those who cause harm thereto. *Id.* at 269. Finally, the court acknowledged that respect must be given to the independent sovereignty of the states, and that federal supremacy must not be lightly invoked. *Id.* at 273.

The *Penn Terra* court established that the enforcement of Pennsylvania's environmental laws was clearly an exercise of the state's police and regulatory power as provided in 11 U.S.C. § 362(b)(4). However, the *Penn Terra* court determined that the injunction ordering the debtor to rectify harmful environmental hazards was not the enforcement of a money judgment, and thus was not encompassed by the automatic stay provision of 11 U.S.C. § 362(a). 733 F.2d at 278–79. In dicta, the *Penn Terra* court noted that, "in some individiual situa-

tions, the exercise of State power, even for the protection of the public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted." 733 F.2d at 273.

The *Penn Terra* court indicated that even where state action is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4), the bankruptcy court may, in its discretion, issue an injunction under 11 U.S.C. § 105. The court noted that Congress explicitly considered 11 U.S.C. § 105 when it excepted government regulation from the automatic stay. Accordingly, the *Penn Terra* court quoted Senate Report Number 95–989:

> Subsection (b) lists seven exceptions to the automatic stay. The effect of an exception is not to make the action immune from injunction.
>
> The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of the proposed title 11, derived from the Bankruptcy Act 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity [statutory citations omitted]. Stays or injunctions issued under these other sections will not be automatic upon commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine whether a particular action which may be harming the estate should be stayed.

733 F.2d at 273 (quoting S.Rep. No. 95–989 at 51, 1978 U.S.Code Cong. & Ad.News at 5787, 5837; H.Rep. No. 95–595 at 342, 1978 U.S.Code Cong. & Ad.News at 5963, 6298).

The United States Supreme Court, in the case of *Ohio v. Kovacs*, 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), commented that the action excepted from the automatic stay in the *Penn Terra* case was, "an effort to enforce the police power statutes of the State, not a suit to enforce a money judgment." *Ohio v. Kovacs*, 105 S.Ct. at 711 n. 11. In discussing the *Penn Terra* decision, the Supreme Court in *Ohio v. Kovacs* explicitly stated, "[t]he automatic stay provision does not apply to suits to enforce the regulatory statutes of the State, but the enforcement of such a judgment by seeking money from the bankrupt ...is another matter." 105 S.Ct. at 711 n. 11.

In *Ohio v. Kovacs*, the Supreme Court analyzed the obligation of a debtor to comply with an injunction which had been issued prior to the commencement of the bankruptcy proceeding. The injunction, obtained by the State of Ohio, required the debtor to clean up a hazardous waste disposal site. The Supreme Court held that this obligation constituted a "debt" or "liability on a claim" which was subject to discharge under the Bankruptcy Code. Justice O'Connor authored a concurring opinion in the case of *Ohio v. Kovacs*, wherein it was noted that the State of Ohio could protect its interest in the enforcement of its environmental laws by giving clean-up judgments the status of statutory liens or secured claims. 105 S.Ct. at 712.

In the case of *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986), *reh'g. denied*, 475 U.S. 1090, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986) (*Midlantic*), the Supreme Court held that a bankruptcy trustee could not abandon property under 11 U.S.C. § 544(a) in contravention of state statutes or regulations designed to protect the public health or safety from identified hazards. In *Midlantic*, the Supreme Court stated:

> Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, *environmental protection*, consumer protection, *safety, or similar police or regulatory laws,* or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.'

106 S.Ct. at 761 (quoting H.R.Rep. No. 95–595, p. 343 (1977), 1978 U.S.Code Cong. & Ad.News 6299). The Supreme Court, however, also noted that the exception to the automatic stay contained in 11 U.S.C. § 362(b)(5) permits the government to enforce " 'nonmonetary' judgments against a debtor's estate." 106 S.Ct. at 761.

The statute at issue in this case is neither a statute dealing with compulsory insurance nor a valid financial responsibility law, both of which would not be affected by the automatic stay. Instead the New Jersey Merit Rating Plan involves a statutory system of civil penalties, the collection of which by the DMV must abide the provisions of § 362.

■ The debtor herein requests damages in the amount of attorneys' fees pursuant to 11 U.S.C. § 362(h). Acts violative of the automatic stay are void *ab initio* whether or not the violating party had notice of the filing of a bankruptcy petition. *Matter of Davis*, 74 B.R. 406, 410 (Bankr. N.D.Ohio 1987). Section 362(h) provides:

> (h) An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

Under this section the term "willful" is construed to mean "a deliberate and intentional act done with the knowledge that the act is in violation of the stay." *Matter of Davis*, 74 B.R. at 410 (citation omitted). "An award of attorneys' fees is appropriate where an initial violation of the stay is followed by Debtor's having to resort to the courts to enforce his rights." *Id.* at 411. The fact that a state agency is the violating party does not place that agency in a better position than any other creditor, even where the agency claims that its agents believed they were acting within the state's police power. *Id.* Proof that a

debtor has been injured by a willful violation of the stay is sufficient to invoke the sanctions of actual and punitive damages, costs and attorneys' fees. *Id.*

■ In the instant matter, debtor's driver's license was suspended on August 14, 1987, approximately six weeks before the debtors filed their Chapter 13 petition on September 28, 1987. On October 23, 1987 an "Order for Meeting of Creditors, Combined with Notice Thereof and of Automatic Stay" was sent to creditors, including the State of New Jersey, Automobile Insurance Surcharge & Collections, at "CN 135 Trenton, New Jersey 08625." [12] regarding debtors' Chapter 13 filing. On November 9, 1987, apparently in response to David Adams' inquiry regarding his merit rating plan surcharge assessment, Maurice R. Guadagno, Manager, Correspondence & Inquiries, on behalf of the State of New Jersey, Automobile Insurance Surcharge and Collections (A.I.S.C.) forwarded a letter to Mr. Adams which read in pertinent part:

> The Attorney General of New Jersey has ruled that surcharges assessed under the Merit Rating Plan are not dischargeable debts in bankruptcy, but are valid assessments levied against future driving performance. Surcharges assessed by this office under the provisions of the Automobile Insurance Reform Act of 1982 (N.J.S.A. 17:29A–33 *et seq.*) must be processed in the same manner as for those licensees not involved in bankruptcy petitions.

On December 16, 1987, debtors' Chapter 13 petition was dismissed for debtors' failure to make pre-confirmation plan payments to the Chapter 13 Standing Trustee and failure to appear at the confirmation hearing set down for that day. An order of dismissal was entered by the court on January 20, 1988. On February 3, 1988 the Clerk of the United States Bankruptcy Court sent a "Notice of Dismissal of Case" to creditors including the State of New Jersey, A.I.S.C. On February 16, 1988 the debtors filed a motion to reinstate their petition as well as a motion to enforce the automatic stay against the State of New Jersey, A.I.S.C. On February 23, 1988 debtors' notice of motion was served upon Maurice Guadagno of the State of New Jersey, A.I.S.C. by regular mail according to the Proof of Service included in debtor's notice of motion to enforce the automatic stay. In a letter to the court dated March 31, 1988 and filed April 4, 1988 from Louis T. DeLucia, Deputy Attorney General, Mr. DeLucia indicated that he did not receive the debtor's notice of motion until March 29, 1988 and that upon receipt of same he contacted debtors' attorney, Neil I. Sternstein, Esquire, at which time the parties agreed that DMV would place the suspension of debtor's driving privileges on "hold" until such time as the court determines the merits of the debtor's motion. As of March 30, 1988, debtor's driving privileges were restored pending the outcome of this matter.

By order entered April 28, 1988 this court reinstated the debtors' Chapter 13 petition. By notice sent from Clerk of the Bankruptcy Court dated June 22, 1988, creditors, including the State of New Jersey, A.I.S.C., were "notified that an order was entered on April 28, 1988 reinstating the [debtors' bankruptcy] petition."

Based on this record the court is not satisfied that a willful violation of the automatic stay was committed by the State of New Jersey, A.I.S.C. Critical to this finding is the fact that the suspension of the debtor's driver's license occurred pre-petition on August 14, 1987. Creditors, including the State of New Jerse, A.I.S.C. were notified some time after February 3, 1988 that the debtor's Chapter 13 petition was dismissed. Immediately upon receipt of no-

---

12. The court notes that the address on correspondence dated November 9, 1987 from the State of New Jersey A.I.S.C. to the debtor lists a mailing address for the State of New Jersey, A.I.S.C. of "CN 136 Trenton, New Jersey 08666–0136" not the address listed on the debtor's schedules and maintained by the Clerk of the Bankruptcy Court. The State of New Jersey, however, has not raised an issue regarding any lack of notice of the filing of the original Chapter 13 petition before this court. In fact the November 9, 1987 letter from Maurice Guadagno to the debtor appears to have involved an inquiry by the debtor regarding the effect of bankruptcy on collection of the merit rating plan surcharge assessments.

tice of the instant application, counsel for the State of New Jersey and counsel for the debtors agreed to the reinstatement of David Adams' driving privilege. Accordingly, this court finds that the State of New Jersey, A.I.S.C. has not violated § 362(h) and, accordingly, the debtor's request for imposition of damages in the form of attorneys' fees is denied.

■■■■ The debtor further requests injunctive relief against DMV prohibiting the DMV from any further attempts to collect the subject surcharges and ordering restoration of the debtor's driving privileges and ordering the DMV to cease and desist from all actions which would prevent the restoration of the debtor's driving privileges because of the debtor's non-payment of the subject surcharges. A proceeding for injunctive relief must be filed and served pursuant to Bankruptcy Rule 7065 and Fed.R.Civ.P. 65. Generally, a complaint commencing an adversary proceeding is filed with the court in which the Title 11 case is pending. Bankr.Rules 7003 and 5005(a); Fed.R.Civ.P. 3. There is no question that debtors' filing of this matter by a motion, rather than by a verified complaint, is procedurally defective. *See also* Bankruptcy Rule 7001(7) ("An adversary proceeding ...is a proceeding ...(7) to obtain an injunction or other equitable relief.") The court in *In re Morysville Body Works*, 89 B.R. 440, 441 (Bankr.E.D.Pa.1988) stated in regard to the interpretation accorded such pleadings:

> As a general proposition [however], this court is willing to overlook an error in presenting a complaint by motion, or vice versa. Our authority to do this flows from Rule 8(f) [Bankr.R. 7008 incorporates Fed.R.Civ.P. 8, which provides that pleadings be construed so as to work substantial justice]; express or implied consent of the parties; and Rule 10 [Bankr.R. 7010 incorporates Fed.R.Civ.P. 10, which identifies the structure and elements of a pleading]. Our ability to overlook such structural deficiencies has become so accepted that it is often done

as a matter of course, without further discussion.

89 B.R. at 441 (citations omitted).

Other cases construe these procedural rules strictly. *See e.g. In re Entz*, 44 B.R. 483, 485 (Bankr.D.Ariz.1984); *In re Dahlquist*, 33 B.R. 101, 103 (Bankr.S.Dak.1983); *Matter of Aerodex, Inc.*, 2 B.R. 49, 50 (Bankr.S.D.Fla.1979). Nevertheless, the court at this time will refrain from issuing any injunctive relief against the DMV. As set forth by the Third Circuit in *Matter of Davis*, 691 F.2d 176, 178 (3d Cir.1982) "[w]e decline to presume" that the DMV "will disregard the obligation imposed upon them by the federal Constitution" to heed the orders of this court. *See Davis, supra,* 691 F.2d at 178. This court shall only act if the parties do not heed the directives set forth in this opinion as to their obligations.

■■■ The court here notes that the debtor's driving privileges have been restored by the DMV. The court notes again that the debtors listed the State of New Jersey, A.I.S.C. as an unsecured creditor on their bankruptcy petition in the amount of $755.00. In connection with David Adams' 1984 conviction, the debtor paid the 1985 surcharge in full, $565.00 of the 1986 surcharge, and no portion of the 1987 surcharge. In connection with David Adams' 1986 conviction, the debtor paid no portion of the 1987 surcharge. This record does not disclose that surcharges for 1988 and 1989 have not been assessed against the debtor though it is clear that such surcharges are assessable pursuant to N.J.S.A. 17:29A–35(b)(3) and N.J.A.C. 13:19–13.-1. Accordingly, this court directs the debtors to amend their bankruptcy petition and modify their Chapter 13 Plan to include the following unpaid pre-petition debts due the DMV:

1. $435.00 (balance on 1986 surcharge assessed in connection with 1984 conviction);

2. $1,000.00 (unpaid 1987 surcharge assessed in connection with 1984 conviction);

3. $250.00 (unpaid 1987 surcharge assessed in connection with 1986 conviction);

4. $250.00 (1988 surcharge assessable in connection with 1986 conviction);  and

5. $250.00 (1989 surcharge assessable in connection with 1986 conviction).

In sum, the debtors' modified plan should include a provision for the *pro rata* payment to DMV on account of its unsecured claim of $2,185.00.

An appropriate order shall be submitted in accordance with this opinion.